487 So.2d 1320 (1986)
MISSISSIPPI FARM BUREAU MUTUAL INSURANCE COMPANY
v.
John Alan GARRETT.
No. 55433.
Supreme Court of Mississippi.
April 30, 1986.
*1321 Edward A. Moss, Jack F. Dunbar, Cynthia I. Mitchell, Holcomb, Dunbar, Connell, Chaffin & Willard, Clarksdale, for appellant.
William Cliff Heaton, Chapman, Bobo & Heaton, Clarksdale, for appellee.
Before WALKER, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
At the outset this appeal asks that we decide to what extent an injured guest passenger in an automobile negligently struck by an uninsured motorist (UM) may settle with his host driver's separate uninsured motorist insurer without impairing his rights against his own uninsured motorist insurer. For the reasons explained below, we hold, as a construction of the insured injured guest passenger's own UM policy, that he may recover via settlement or otherwise all that is reasonably available from *1322 his host driver's separate UM coverage and then resort to his own UM coverage to the extent of his damages or the limits of liability of that policy, whichever is first reached.
Beyond this we are presented an evidentiary question: is a chiropractor precluded from giving opinion testimony where the subject of the opinion is within the field of chiropractory because the subject matter of the opinion is also within the field of medicine? We answer in the negative and make clear below that what is necessary is that the opinion be in the field of chiropractory as practiced and that the witness be properly qualified in that field. That there may be areas of overlap between the fields of medicine and chiropractory is a matter of no moment, so long as the witness is qualified in his field and stays there.

II.
On November 29, 1980, John Alan Garrett, age 22, of Tallahatchie County, Mississippi, and two others were passengers in an automobile owned and being driven by Dorothy Yarbro. While proceeding on Highway 3 between Lambert and Tutwiler, the Yarbro vehicle was struck by an automobile driven by E.B. Smith. Smith was an uninsured motorist.
Following the accident, Garrett was hospitalized in Clarksdale, Mississippi, for seven or eight days. He was treated by Drs. Sartin and Baine of the Clarksdale Surgical Clinic and was thereafter referred to Dr. Joseph Hudson of the Semmes-Murphy Clinic in Memphis by whom he was discharged on April 15, 1981.
In late November, 1981, almost a year after the accident, Garrett stumbled over a branch or twig and fell. On November 25, 1981, he saw for the first time Dr. Harry A. Tillman, a chiropractor, whose office was in Clarksdale, Mississippi. Garrett gave Dr. Tillman a history of the fall and stated that the pain felt like the same injury he had had the previous November in a car wreck.
Dorothy Yarbro, driver of the automobile in question, was covered by an insurance contract with Dairyland Insurance Company. This contract provided both liability and uninsured motorist coverage. The UM provisions of the Dairyland policy afforded maximum coverage of $10,000.00 per person and $20,000.00 per occurrence.
Because E.B. Smith was an uninsured motorist and because the facts suggested that he was almost wholly at fault in causing the November, 1980, accident, each of the four occupants of the automobile asserted claims against Dairyland under the UM coverage in its policy insuring Yarbro. On April 15, 1981, Garrett effected a settlement with Dairyland wherein he received $7,517.00 under the UM coverage and an additional $1,000.00 under the liability coverage Dairyland afforded Yarbro. Yarbro received a $4,600.00 settlement under her UM coverage. Lawanda Turman got $800.00. The record is not precise with respect to the fourth occupant, Randy Porter. It appears that he received from Dairyland between $3500.00 and $4,000.00. In sum, it appears that between $16,417.00 and $16,917.00 of the $20,000.00 per occurrence coverage was exhausted.
In addition, Garrett had three automobile insurance policies with Mississippi Farm Bureau Mutual Insurance Company ("Farm Bureau"). Each of the policies contained $10,000.00 per person uninsured motorist coverage. On June 27, 1981, Garrett filed suit against Farm Bureau, charging that his damages arising out of the November, 1980, accident greatly exceeded what he had received from Dairyland and demanding judgment for the full, stacked $30,000.00.
After considerable pre-trial wranglings the case was called for trial on March 7, 1983, in Sumner, Mississippi, at the conclusion of which the jury returned a verdict for Garrett and against Farm Bureau in the amount of $30,000.00. This appeal is taken following the Circuit Court's order denying Farm Bureau's motion filed August 24, 1983, for judgment notwithstanding the verdict, or, in the alternative, for a *1323 new trial, or, in the alternative, for a remittitur.

III.
Farm Bureau first argues that Garrett may have no recovery under the three uninsured motorist contracts Farm Bureau had with him because he failed to exhaust the coverage afforded him under the Dairyland policy, wherein Garrett's driver, Dorothy Yarbro, was the insured.
The argument turns on a proper construction of the following provision found in the UM coverage section of each of the Farm Bureau/Garrett policies:
With respect to bodily injury or property damage sustained by an insured while occupying or being struck by an automobile not owned by the principal named insured, the insurance under this endorsement shall apply only as excess insurance over any other similar insurance available to each insured and applicable to such automobile as primary insurance, and this insurance shall then apply only in the amount of which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.
We consider this proposition in the context of our accepted principles that the uninsured motorist statute, Miss. Code Ann. §§ 83-11-101, et seq. (Supp. 1985), and policies issued thereunder are to be construed liberally to provide coverage and strictly to avoid or preclude exceptions or exemptions from coverage. Matthews v. State Farm Mutual Automobile Ins. Co., 471 So.2d 1223, 1225 (Miss. 1985). In implementation of those principles we have repeatedly held that insurers may not employ policy language to cut down on coverage mandated by our UM statute. See, e.g., State Farm Mutual Automobile Ins. Co. v. Kuehling, 475 So.2d 1159, 1161 (Miss. 1985); Talbot v. State Farm Mutual Automobile Ins. Co., 291 So.2d 699, 703 (Miss. 1974).
The policy language quoted above plainly required that Garrett first resort to the Dairyland/Yarbro policy. That policy afforded "other similar insurance" within the meaning and contemplation of the Farm Bureau/Garrett policies.
Garrett, indeed, did pursue Dairyland first. He settled his claim under the UM coverage of the Dairyland/Yarbro policy for $7,517.00. The per person coverage limit for that policy was $10,000.00. Farm Bureau argues that Garrett left $2,483.00 on the table and, accordingly, is barred from recovery against Farm Bureau because he did not exhaust the $10,000.00 Dairyland/Yarbro UM coverage. Such exhaustion, according to Farm Bureau, is a prerequisite of its liability on any of the three UM coverages it wrote for Garrett.
Farm Bureau's point turns  and fails  upon the construction of the word "available". According to the language quoted above, Farm Bureau's obligations kick in insofar as Garrett has sustained injuries for damages over and above "other similar insurance available" to him. Farm Bureau says that $10,000.00 worth of "other similar insurance" was "available" to Garrett. As Garrett did not secure the full $10,000.00, he has not fulfilled the condition precedent to the present action.
The construction Farm Bureau would give the word "available" bears little relationship to the real world. The assertion of personal injury claims against insurers, directly or indirectly, is seldom without costs and risks. Legal expenses and attorneys fees, not to mention expenditures of time and energy plus emotional wear and tear, attend all litigation. Looming above all litigation costs today is delay. Beyond these costs the risk of failure is ever present no matter how open and shut the case on its face may appear. In this context, where there is a maximum potential recovery of $10,000.00, Garrett's settlement for $7,517.00 was prima facie reasonable.
As we understand it, Farm Bureau would have required, as a condition of his assertion of a claim on the Farm Bureau uninsured motorist policies, that Garrett have turned down the $7,517.00 settlement and gone to trial seeking the full $10,000.00, *1324 incurring the costs mentioned above and the risk that those costs might in fact exceed $2,483.00 and, of course, risking that the outcome of the litigation might be less favorable than the settlement. Farm Bureau's theory has an other worldly air to it.
The word "available" in the policies in issue refers to those sums reasonably obtainable by Garrett having in mind the nature and extent of his injuries, the facts regarding the liability of the uninsured motorist, the amount of the settlement offered, discounted by the costs and risks of seeking a greater sum.
Here there was a further hazard to Garrett had he turned down the $7,517.00 and sued Dairyland for the full $10,000.00. Three other parties had claims arising out of the November, 1980 accident. While the per person coverage limits of the Dairyland/Yarbro UM policy were $10,000.00, the per occurrence limits were $20,000.00. Because there were two or more claimants, the per occurrence coverage was activated. State Farm Mutual Automobile Insurance Co. v. Acosta, 479 So.2d 1089, 1091 (Miss. 1985). Failure to accept the bird in the hand and pursuing the two in the bush could well have resulted in Garrett, even if he obtained a $10,000.00 judgment, finding that the per occurrence coverage had been exhausted or substantially depleted by the other three claims.
Farm Bureau seizes upon the "applicable limit of liability" in the last conjunctive clause of the Other Insurance provision in support of its theory. This, we are told, refers to the $10,000.00 limit in the Dairyland policy and means that the Farm Bureau UM coverage is never activated until this "applicable limit of liability" has been exceeded which in this case never happened because Garrett settled for $7,517.00 instead of the full $10,000.00.
When more obscure sentences are written, a major source will be the pens of the draftsmen of insurance policies. The sentence at issue is actually one of the less offensive  it is only ambiguous. The first clause unequivocally says that the Farm Bureau UM coverage "shall apply" ... over any other similar insurance available... ." [Emphasis supplied] As explained, the other insurance available was $7,517.00. The second conjunctive clause then states that the Farm Bureau UM coverage "shall ... apply ... [when the insured's damages] exceed the applicable limit of liability of such other insurance." [Emphasis supplied] That limit of liability is $10,000.00. Following accepted canons of construction, we resolve the ambiguity in favor of the insured. Government Employees Insurance Company v. Brown, 446 So.2d 1002, 1006 (Miss. 1984). So construed the Farm Bureau UM coverage shall apply to the extent Garrett's damages exceed $7,517.00.
The record being totally devoid of any hint or inference of fraud or collusion in the Garrett/Dairyland settlement, or that the $7,517.00 amount was a sham, we hold that, as a matter of the construction of the language of the three Farm Bureau/Garrett contracts, those coverages are available insofar as each exceeds $7,517.00.
This Court was faced with a very similar argument in Harthcock v. State Farm Bureau Mutual Automobile Insurance Co., 248 So.2d 456 (Miss. 1971). In that case the injured party had made a $4,500.00 settlement with the party primarily liable, in the context of an uninsured motorist coverage of $5,000.00. State Farm argued that the settlement precluded the injured party from recovering under the secondary policy and invoked a clause essentially identical to that with which we are here concerned. This Court rejected the argument and held that the injured party could recover under the secondary policy for all damages sustained over and above the amount received in the prior settlement subject, of course, to the limits of liability in the secondary policy.
The instructions given the jury make it clear that in this case the law was followed. Jury Instruction D-3A correctly advised the jury that Garrett had already received $8,517.00 from Dairyland and that the jury could return a verdict for Garrett only to *1325 the extent that his damages exceeded $8,517.00 (but were less than $38,517.00). Farm Bureau's coverage was wholly treated as excess insurance as above we hold it should have been.
The instant assignment of error is denied.

IV.
Garrett executed a general release under the liability coverage of the Dairyland/Yarbro policy in return for the payment of $1,000.00. He also executed a release in favor of Dairyland for $7,517.00 under the UM coverage of that policy. Farm Bureau argues here that this release operates to release E.B. Smith, the uninsured motorist. This, Farm Bureau says, serves to impair Farm Bureau's subrogation rights against Smith and thus operates as a waiver of Garrett's claim against Farm Bureau. Farm Bureau relies on the language of its policy to the effect that Garrett should do nothing which would impair or impede Farm Bureau's subrogation rights.
A similar point was pressed in Harthcock. In that case, we thwarted an uninsured motorist insurer's attempt to forbid settlement with a tort feasor [such as Dairyland/Yarbro] other than the uninsured motorist.
The coverage afforded by these policies is mandatory under the statute and may not be cut down by a policy exclusion. The construction placed on this provision by State Farm and Universal renders the uninsured motorist coverage conditional in that it does not apply unless the insured surrenders the right to settle with another tort-feasor. This exclusion, when applied to tort-feasors other than the uninsured motorist, is an invalid abridgement of the coverage required by the statute, and is void.
248 So.2d at 459-60; State Farm Auto Insurance Co. v. Nester, 459 So.2d 787, 791 (Miss. 1984).
There is a further reason why Farm Bureau's theory is untenable. Neither Garrett nor anyone else has signed any document releasing Smith, the uninsured motorist, from anything. Farm Bureau's theory proceeds on the assumption that the release of Yarbro and Dairyland somehow operated to release all tortfeasors, including Smith. This, we are told, impaired Farm Bureau's subrogation rights against Smith.
The theory is so much wishful thinking. Whatever the law may once have been, an injured party executing a release incident to a settlement with one tortfeasor releases others by whom or on whose behalf no considerations have been given only where the intent to release the others is manifest. Smith v. Falke, 474 So.2d 1044, 1046 (Miss. 1985); Restatement (Second) of Torts § 885(1) (1979). No such intent appears here.
The assignment of error is denied.

V.
We are next called upon to consider whether a chiropractor may qualify as an expert witness and give opinion testimony consistent with our rules of evidence.
Dr. Harry A. Tillman, a chiropractor, was called as a witness and qualified as an expert in the field of chiropractory. Over Farm Bureau's objection, Dr. Tillman gave his diagnosis of Garrett's condition, his opinion that Garrett's injuries were caused by the November, 1980, accident, and his additional opinions regarding the likelihood of Garrett experiencing further problems, future disability, future pain and suffering and mental and emotional anguish.
The question of whether a chiropractor may as an expert witness give opinion testimony in our courts is one of first impression. In other jurisdictions, the general rule seems to be that in a personal injury action a chiropractor is competent to express an opinion concerning the probable cause of an injury or physical condition, as well as the probable effects and duration, permanence and future treatment requirements, provided, of course, that the testimony lies within the field of chiropractory and a proper foundation is laid with respect *1326 to the qualifications and competence of the particular chiropractor witness. The cases are collected in Annotation, Chiropractor's Competency As Expert In Personal Injury Action As To Injured Person's Condition, Etc., 52 A.L.R.2d 1384 (1957) and A.L.R.2d Later Case Service.
In considering the admissibility of expert testimony in any field of endeavor, we inquire whether the field of expertise is one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion. Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); House v. State, 445 So.2d 815, 822 (Miss. 1984); see also United States v. Downing, 753 F.2d 1224 (3d Cir.1985); Giannelli, The Admissibility Of Novel Scientific Evidence: Frye v. United States A Half Century Later, 80 Colum.L.Rev. 1197 (1980).
Here we give considerable weight to the legislative determination that chiropractors should be licensed and the field of chiropractory regulated via a scheme comparable to that in force with respect to other learned professions.
Miss. Code Ann. § 73-6-1 (Supp. 1985) "Practice of Chiropractic" defined:
The practice of chiropractic involves the analysis of any interferences with normal nerve transmission and expression, and the procedure preparatory to and complementary to the correction thereof, by an adjustment of the articulation of the vertebral column and its immediate articulations for the restoration and maintenance of health without the use of drugs or surgery.
Requirements for applicants for a license to practice chiropractory include: two academic years in an accredited institution of higher learning and four academic years at a school of college of chiropractic recognized by the State Board of Chiropractic Examiners. The examination to practice chiropractory, "shall consist of testing and practical, theoretical and physiological chiropractic analysis, theoretical and practical chiropractic common nerve tracing, spinal analysis, the operation of x-ray machines and interpretation of x-rays as applied to chiropractic use, a basic science knowledge of the subjects of anatomy, physiology, and pathology". A graduate must also receive not less than 40 clock hours of instruction in the operation of x-ray machinery and not less than 40 clock hours of instruction in x-ray interpretation and diagnosis. Miss. Code Ann. § 73-6-13 (Supp. 1985).
This Court has recognized that operation and interpretation of x-rays is an area of expertise within the scope of chiropractic practice. Norville v. Miss. State Medical Association, 364 So.2d 1084, 1087 (Miss. 1978).
The field of chiropractory being one within which expert opinions may generally be given, we turn to the case at bar. Our inquiry is whether, given the facts and circumstances of this case, the subject matter of the proffered testimony is of the sort with respect to which expert opinion evidence will be of assistance to the trier of fact.[1]Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); House v. State, 445 So.2d 815, 822 (Miss. 1984). It is safe to say that in personal injury cases expert opinion evidence regarding the nature and extent of the plaintiff's injuries, the cause therefor, and such matters as future disability and courses of treatment will assist the trier of fact to understand the evidence on these important points.
The final inquiry for the trial court is whether this witness, Henry Tillman, is qualified. After the trial judge has determined that expert testimony will be of assistance to the trier of fact, our law requires that he or she then determine whether the witness sought to be presented is qualified as an expert by knowledge, skill, expertise, training or education. Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985). An expert witness must be qualified in fact before he or she may provide opinion evidence, *1327 although necessarily this determination involves the exercise of a certain amount of discretion on the part of the trial judge. Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); Hollingsworth v. Boviard Supply Co., 465 So.2d 311, 314-15 (Miss. 1985); Pharr v. Anderson, 436 So.2d 1357, 1359 (Miss. 1983). Suffice it to say that the trial judge should seek to assure that the proffered witness really is an expert in the area in which his opinion testimony is offered.
Here there is no serious question but that Dr. Tillman qualifies as an expert in the field of chiropractory. The record reflects that he has met all of the requirements for licensing in the State of Mississippi and that he is in fact a licensed and practicing chiropractor. Furthermore, the testimony of Dr. Tillman reflects that his opinions were carefully limited to the field of chiropractory. Each question was asked with the preface, "Do you have an opinion ... with a reasonable degree of chiropractic probability?" Dr. Tillman also showed the jury x-rays taken over the course of treatment and analyzed those x-rays describing progression from the position of vertebrae.
Farm Bureau's objection in the end seems to be that Dr. Tillman gave opinions which are within the field of medicine. Medical opinions, the argument goes, may be expressed only by persons qualified as medical doctors and practitioners. The obvious implication of the argument is, if there should be any overlap between the fields of medicine and chiropractory, the latter must give way. In other words, Farm Bureau would have us bar from our courtrooms opinions within the field of chiropractory given by qualified chiropractors on the sole ground that the field overlaps with and, in their view, invades the province of medicine. This is not our law.
To begin with, this Court has recognized that the taking and interpretation of x-rays is within the scope of chiropractic practice. Norville v. Mississippi State Medical Association, 364 So.2d 1084, 1087 (Miss. 1978). That medical doctors are also qualified with respect to x-rays in no way ousts the chiropractor of his ability in law and in fact to perform as an expert in that area. The same is true with respect to the remainder of the field of chiropractory.
The proper focus for the question presented is whether Dr. Tillman, by education, training, experience and learning, is qualified to give the opinions which he was asked to give. The fact that medical doctors may also be so qualified  that medical doctors might even be qualified to give better and more reliable opinions is beside the point.
From this record it is substantially apparent that, by reason of his education, skill and experience, Dr. Tillman was above that minimal level of personal expertise necessary to give an opinion regarding the diagnosis, causation and prognosis of Garrett's injury. In giving these opinions he carefully limited his testimony to the field of chiropractory.
As with any expert witness, the opposing litigant had full right of cross-examination both with respect to the qualifications of the witness and the bases and validity of his opinions. Counsel for Farm Bureau took full advantage of this opportunity. That the jury apparently chose to credit Dr. Tillman's testimony will seldom be a matter that can be invoked on appeal as a basis for relief. We are of the opinion that the trial judge's determination that the chiropractor's testimony would be helpful to the jury was within his discretion. Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); Hollingsworth v. Boviard Supply Company, 465 So.2d 311 (Miss. 1985). We will not reverse on this ground.

VI.
Farm Bureau argues that the overwhelming weight of the evidence in this case establishes that Garrett suffered no permanent disability and no future damages and that as such the jury verdict for $30,000 cannot be supported and must be reversed. Testimony of Dr. Tillman and testimony from the deposition of Dr. Baine are said to be pure speculation and thus an *1328 inadequate basis for such a verdict. Garrett responds that evidence is plentiful suggesting damages of inability to work, hospitalization costs and current back problems and probability of future back problems. Garrett correctly notes that our scope of review on this point is quite narrow: we may reverse and order a new trial only if the verdict is so excessive that it shocks the conscience of the Court. See e.g., Bankers Life and Casualty Company v. Crenshaw, 483 So.2d 254, 278-79 (Miss. 1985).
Similar injuries were sustained by the plaintiff in General Motors Acceptance Corp. v. Layton, 353 So.2d 749 (Miss. 1977) wherein the plaintiff received a jury verdict of $20,000. Testimony there included a doctor's statement that, although he found no evidence of arthritis in the plaintiff's knee, such persons were more likely to develop arthritis in joints, proof of medical expenses of $813.60 and testimony of pain and hospital confinement for eight days. In the case at bar Garrett was hospitalized for seven days; evidence showed that he could not return to his work as a roughneck for an oil company due to his back injury; Dr. Tillman testified that the problems with Garrett's back would continue in the future and were susceptible to future aggravation as a result of the accident; and medical expenses amounted to $1,537.00.
In upholding the jury verdict in Layton, the Court held that the question of damages was within the province of the jury and that the $20,000 verdict was not so large as to indicate bias, passion and prejudice. See also McNair Transport, Inc. v. Crosby, 375 So.2d 985, 987 (Miss. 1979); French Drug Company, Inc. v. Jones, 367 So.2d 431, 436 (Miss. 1978); Screws v. Parker, 365 So.2d 633, 637 (Miss. 1978).
In answer to Farm Bureau's charge of speculation this Court has noted in the past:
It is no answer to say that the jury's verdict involves speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Some guesswork and speculation are necessarily involved in practically all jury verdicts, including those no one would dream of suggesting be disturbed.
These standards, of course, are derived from many decisions of this Court. Beyond that, the limited power of the trial court to review a jury's verdict is a function of Constitutional mandate. Miss. Const. (1890) Art. III, Section 31.
.....
We emphasize that our powers on appellate review are even more restricted. Our institutional role mandates substantial deference to the jury's finding of fact and to the trial judge's determination whether a jury issue was tendered... .
The jury's verdict is a finding of fact. Unless we can say that no rational jury could on this proof have assessed damages of $27,000 the award must be left undisturbed. We will not vacate or reduce a damage award unless it is so out of line as to shock the conscience of the Court. Anderson v. Jaeger, 317 So.2d 902, 907 (Miss. 1975).
City of Jackson v. Locklar, 431 So.2d 475, 478, 481 (Miss. 1983).
A jury verdict of $30,000 is not  on these facts  such that shocks the conscience of this Court. This final assignment of error must fail, as do each of the others.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] While Rule 702, Miss.R.Ev., was not in effect at the time of trial, what we say here is consistent with that rule. Hardy v. Brantley, 471 So.2d at 366 n. 3.