# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-1192


**CARRIE MENARD**

**VERSUS**

**THE AUDUBON INSURANCE GROUP, ET AL.**


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2004-2177,
HONORABLE PATRICK L. MICHOT, DISTRICT JUDGE

************

**MICHAEL G. SULLIVAN**
**JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and
Michael G. Sullivan, Judges.


**AFFIRMED.**

**J. Clemille Simon**
**Barry L. Domingue**
**Simon Law Offices**
**Post Office Box 52242**
**Lafayette, Louisiana  70505**
**(337) 232-2000**
**Counsel for Plaintiff/Appellant:**
       **Carrie Menard**

**Michael P. Corry**
**Brandon O. Wallace**
**Briney & Foret**
**Post Office Drawer 51367**
**Lafayette, Louisiana  70505-1367**
**(337) 237-4070**
**Counsel for Defendants/Appellees:**
       **Donald J. Claxton**
       **The Audubon Insurance Group**

**Shannon J. Gremillion**
**Bolen, Parker & Brenner**
**Post Office Box 11590**
**Alexandria, Louisiana 71315-1590**
**(318) 445-8236**
**Counsel for Defendant:**
**New Hampshire Insurance Company**

**Frank S. Slavich, III**
**Perret Doise**
**Post Office Drawer 3408**
**Lafayette, Louisiana 70502-3408**
**(337) 262-9000**
**Counsel for Intervenor:**
**Louisiana Farm Bureau Casualty Insurance Company**

**Aaron J. Allen**
**Attorney at Law**
**Post Office Drawer 3204**
**Lafayette, Louisiana 70502-3204**
**(337)232-9918**
**Counsel for Intervenor:**
**David Barczyk, D.C.**

**Barbara Bossetta**
**Deutsch, Kerrigan & Stiles**
**755 Magazine Street**
**New Orleans, Louisiana 70130**
**(504) 581-5141**
**Counsel for Intervenor:**
**J. Monroe Laborde, M.D.**

SULLIVAN, Judge.

Carrie Menard filed suit for personal injuries to her neck, back, and right knee that were allegedly sustained in an automobile accident on May 2, 2003, when her vehicle was struck from behind by one driven by Donald Claxton.[1] After a jury trial, Ms. Menard was awarded $20,000.00 for past and future pain and suffering; $20,000.00 for past medical expenses; and $10,000.00 for future medical expenses. The jury chose not to award any amount for loss of enjoyment of life. On appeal, Ms. Menard challenges the adequacy of each award, arguing that this court should conduct a *de novo* review of the jury's findings because the trial court committed legal error in restricting the testimony of her treating chiropractor. For the following reasons, we affirm the jury's verdict in all respects.

### Discussion of the Record

Mr. Claxton, while driving a Ford Contour, rear-ended Ms. Menard's Honda Civic shortly after she had come to a complete stop in traffic that was backed up for a red light on Highway 733 in Lafayette, Louisiana. The trial court would later grant summary judgment as to liability, finding that Mr. Claxton was solely at fault in the accident.

Ms. Menard did not seek medical attention on the day of the accident, although she complained of headaches and soreness at the scene. The next morning, however, she went to the emergency room at Our Lady of Lourdes Regional Medical Center, where she was diagnosed with a cervical strain after complaining of pain in her neck and shoulder blades. She next saw a family practitioner, Dr. Freddie Fandal, on May 7, 2003, initially complaining of headaches and severe neck pain that radiated

---

[1]Ms. Menard, who was nineteen at the time of the accident, had married Seth Hoffpauir by the time of the trial that began on August 30, 2005. In keeping with the caption of the case, however, we will refer to her as "Ms. Menard" throughout this opinion.

between the shoulders. Dr. Fandal referred Ms. Menard to a physical therapist, Debbie Fontenot, who treated her for a cervical condition manifested by spasms in the neck, trapezius, and rhomboid muscles. After approximately seventeen visits, Ms. Fontenot recorded that, on June 19, 2003, Ms. Menard was asymptomatic, and she discharged her at that time. On that same date, Ms. Menard also saw Dr. Fandal, stating that all of her upper torso symptoms had resolved, but reporting for the first time pain in the right knee. Dr. Fandal noted that Ms. Menard had full range of motion of the knee, with tenderness around the patella, but with no effusion. In his deposition, Dr. Fandal testified that he related Ms. Menard's headaches and upper torso complaints to the accident, but, because she did not report any knee complaints on either her initial visit of May 7, 2003, or on the next visit of May 21, 2003, he thought it possible that she injured her knee in the accident only if she had no prior knee complaints, if she sustained a trauma to the knee in the accident, and if she had complained of knee problems to Ms. Fontenot. In her deposition, Ms. Fontenot testified that she did not record a trauma to the knee in Ms. Menard's chart, although she recalled a conversation in which Ms. Menard told her that the CD player in her car became dislodged and struck her right knee in the accident.

Approximately one month after being discharged by Dr. Fandal, Ms. Menard sought treatment from a chiropractor, Dr. David Barczyk, on July 23, 2003, complaining of neck pain radiating to the right arm, lower back pain on the right side, and right knee pain. Observing that the right knee was too swollen and painful to examine that day, Dr. Barczyk ordered an MRI, taken on July 31, 2003, which revealed a possible tear of the anterior cruciate ligament (ACL), but with no signs of instability, and a small amount of joint fluid. Dr. Barczyk would eventually refer

2

Ms. Menard to an orthopedic surgeon, Dr. John Cobb, for treatment of her right knee, but he continued to treat her neck and back symptoms through the time of trial. At trial, he identified her current complaints as neck pain, back pain, and headaches, for which he was still treating her twice a week. He considered her condition to be a chronic one that had a fair prognosis, but with some "waxing and waning" in the future.

As recommended by Dr. Barczyk, Ms. Menard first saw Dr. Cobb on August 12, 2003. Her complaints that day were diffused knee pain of an aching or burning nature and intermittent bouts of swelling, for which she was using a knee brace and crutches. At this visit, she reported a history of a rear-end collision in which her CD player was ejected and struck her knee. Dr. Cobb's examination did not reveal any fluid in the knee or any instability of the ligaments, and he did not believe that the MRI revealed any significant injuries to the ligaments. Diagnosing a sprain/strain injury to the knee without any structural tears, Dr. Cobb recommended a physical therapy program and prescribed anti-inflammatory medication. After eight visits with physical therapist Fran Mancuso, Ms. Menard returned to Dr. Cobb on September 3, 2003, stating that her symptoms had just about resolved. At that time, Dr. Cobb discharged her from physical therapy and from routine follow-up, recommending instead a home exercise program.

On December 22, 2004, approximately fifteen months later, Dr. Barczyk again referred Ms. Menard to Dr. Cobb, this time for an evaluation of her neck. At that time, she complained of pain in the neck, in both shoulders, in the entire back, and in the right buttock to the knee. She also reported that her knee was popping and that it gave way when climbing stairs. Dr. Cobb did not believe that a cervical MRI of

3

March 30, 2004 revealed a significant disc problem, but he found that a Digital Motion X-ray (DMX) from Dr. Barczyk's office revealed some facet laxity at C4-5 and C5-6. Dr. Cobb explained to Ms. Menard that this was not a surgical condition, and at trial, he testified that continued care from Dr. Barczyk would be the first line of recommended treatment, to be followed with interventional pain management if that course was not successful. Dr. Cobb further testified at trial that, at twenty-seven months post-injury, Ms. Menard's neck condition was chronic and that he did not expect to see a spontaneous resolution after this much time. Concerning her knee, Dr. Cobb recommended arthroscopic surgery with a possible chondroplasty to correct a condition known as chondromalacia, or a softening of the cartilage under the knee cap, that is associated with patella femoral pain syndrome. Dr. Cobb believed that all of Ms. Menard's symptoms and injuries were related to the May 2, 2003 accident, based upon the history that she reported to him.

At Defendants' request, Ms. Menard was examined by another orthopedic surgeon, Dr. Stanley Foster, on June 2, 2005. Her complaints at that time were a constant burning pain in the knee, with popping and giving out; a constant aching pain in the neck with muscle spasm and headaches once or twice a week; and pain every day in the lower back. Dr. Foster testified that he did not find anything objectively abnormal in his examination, although in his written report he noted that Ms. Menard did complain of tenderness at the base of the skull, between the shoulder blades, in the lumbar spine, and along the inside portion of the right knee. Dr. Foster believed the MRIs of the neck and right knee were both normal, although he thought that Ms. Menard may have chondromalacia or a contusion of the patella. Noting Dr. Fandal's release of June 19, 2003, as well as the lack of relief from Dr. Barczyk's

4

treatment, Dr. Foster believed that further chiropractic care of her neck was unnecessary. Additionally, because a review of Ms. Menard's medical records indicated that her first complaint of knee pain was not made until six weeks after the accident to Dr. Fandal on June 19, 2003, Dr. Foster did not believe that her knee problems were related to the accident. When told of Ms. Fontenot's recollection of a conversation with Ms. Menard about her knee as early as May 13, 2003, Dr. Foster stated that her knee complaints could be related to trauma in the accident, if that conversation did in fact take place.

Ms. Menard testified that she went to the emergency room on the morning following the accident, after she woke up with her shoulders feeling as though they were "glued to [her] ears." She explained that she was more concerned with her neck and back because those were the areas that were initially the most painful and that, during her treatment with Dr. Fandal and Ms. Fontenot, she thought that her knee would "fix itself." In her deposition, she testified that her knee pain began one day around July of 2003 when her knee "just popped" while stretching her leg. At trial, she explained that her knee had been popping before that time, but she did not think it important because it did not stop her from walking. She acknowledged that she was diagnosed with fibromyalgia and migraine headaches due to TMJ problems when she was twelve or thirteen years old, but she stated that those problems persisted for only a year after her diagnosis.

**Opinion**

On appeal, Ms. Menard argues that the trial court erred in improperly limiting the testimony of her treating chiropractor by refusing to allow him to discuss the causal relationship between her injuries and the accident, the need for future

5

chiropractic care, and the diagnostic studies that were performed. She argues that this error requires a *de novo* review of this case, particularly in review of the awards for general damages and future medical expenses. She also contends that the jury erred in awarding only $20,000.00 in past medical expenses when she submitted bills totaling $20,881.54.

For the following reasons, we find that a *de novo* review is not warranted in this case. Discussing the standard of review when legal error is argued, this court in *Vaughn v. Progressive Security Insurance Co.*, 03-1105, pp. 3-4 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207, 1213-14, *writ not considered*, 05-855 (La. 5/13/05), 902 So.2d 1004, explained:

> The standard of review for evidentiary rulings of a trial court is abuse of discretion. *Johnson v. First Nat'l Bank of Shreveport*, 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, *writs denied*, 01-2770, 01-2783 (La.1/4/02), 805 So.2d 212, 213. If a trial court has committed error in its evidentiary rulings such that the jury verdict is tainted by the errors, the appellate court should conduct a *de novo* review. *Evans v. Lungrin*, 97-541, 97-577 (La.2/6/98), 708 So.2d 731; *McLean v. Hunter*, 495 So.2d 1298 (La.1986).
>
> In *Evans*, the supreme court stated: "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Evans*, 708 So.2d at 735. Under *Evans*, a *de novo* review should not be undertaken for every evidentiary exclusion error but should be limited to "consequential errors," which are errors that "prejudiced or tainted the verdict rendered." *Wingfield v. State ex. rel. Dep't of Transp. and Dev.*, 01-2668, 01-2669, p. 15 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 799, *writs denied*, 03-313, 03-339, 03-349 (La.5/30/03), 845 So.2d 1059, 1060, *cert. denied*, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003).
>
> If we determine that a *de novo* review is not required here, we must review the jury's findings under the manifest error/clearly wrong standard of review which provides that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). To reverse a jury's finding, we must find from the record that a reasonable factual basis does not exist for the finding and, further, that the finding is clearly wrong. *Id.*

In the present case, the trial court restricted Dr. Barczyk from testifying about causation, future chiropractic care, and certain diagnostic tests used in the treatment of his patients, presumably based upon his status as a chiropractor rather than a medical doctor. Although we have found no Louisiana cases discussing the extent to which a chiropractor's opinion is admissible, we note some limited treatment of the issue in other jurisdictions. *See, e.g., Miss. Farm Bureau Mut. Ins. Co. v. Garrett*, 487 So.2d 1320, 1327 (Miss.1986) (holding that a chiropractor is qualified to render an opinion regarding the "diagnosis, causation and prognosis" of injury and that "the taking and interpretation of x-rays" is within the scope of chiropractic practice) and *Hodder v. United States*, 328 F.Supp.2d 335, 347 (E.D.N.Y. 2004) (citing authority for the principle that "chiropractors are deemed competent expert witnesses testifying on the nature of the ailment and causation").

Even if we agreed with Ms. Menard that the trial court erred in restricting Dr. Barczyk's testimony, however, we would not disregard the jury's verdict by conducting a *de novo* review, given the extensive testimony about causation, recommended treatment, and diagnostic studies from other health care providers. Dr. Cobb, testifying before Dr. Barczyk at trial, related all of Ms. Menard's symptoms and injuries to the accident, given the history that was reported to him. Furthermore, although Dr. Cobb, as an orthopedic surgeon, stated that he would not defer to a chiropractor in a disagreement as to treatment, he, nonetheless, believed that Dr. Barczyk's continued care was the best course of treatment for Ms. Menard's ongoing neck problems. Dr. Cobb interpreted the DMX ordered by Dr. Barczyk as revealing areas of ligament laxity in the cervical spine, and both he and Dr. Foster commented on the results of the two MRIs. Dr. Foster disagreed with Dr. Cobb as

7

to the causation of Ms. Menard's ongoing neck problems and all of her knee problems, but even he stated that he would relate the knee injury to trauma in the accident, assuming that Ms. Fontenot was correct in her recollection of an undocumented conversation with Ms. Menard. Ms. Mancuso, the physical therapist who treated Ms. Menard's knee, also related her symptoms to the automobile accident, according to the history that was reported to her.

Each of the health care providers who testified regarding causation based his or her opinion on either the history as provided by Ms. Menard or on medical records that were reviewed. Even in his proffered testimony that the jury did not hear, Dr. Barczyk related all of Ms. Menard's knee problems to the accident, based upon the assumption that Ms. Fontenot's and Ms. Menard's testimony was accurate about when the symptoms began and when they were reported. Given the numerous discrepancies between the medical records and testimony, it was the job of the jury as the trier of fact to decide the question of causation based upon its credibility evaluations. Further, given the detailed evidence that each side presented to the jury on causation, we cannot conclude that its verdict was so tainted by the trial court's restriction of Dr. Barczyk's testimony to warrant a *de novo* review by this court.

Applying the manifest error standard of review to the awards for general damages and future medical expenses, we find no error. The record supports a finding by the jury that all of Ms. Menard's claimed injuries were either not caused by the accident or did not require future medical care.[2] Although Ms. Fontenot's testimony supports that of Ms. Menard that her knee symptoms developed earlier than

---

[2]We note that, in closing arguments, Ms. Menard's counsel argued that Ms. Menard would incur $19,000.00 in future medical expenses for her neck and knee. The jury, however, awarded only $10,000.00 for this item of damages.

first reported, Ms. Menard's deposition testimony suggests they spontaneously appeared later. While Dr. Cobb recommended continued chiropractic treatment, Dr. Foster disagreed, based upon Ms. Menard's earlier release from care and the lack of success of that treatment. As the supreme court recently stated in *Detraz v. Lee*, 05-1263, p. __ (La. 1/17/07), __ So.2d __, __ (citation omitted), "When there are different theories presented to the fact finder for their consideration, the fact finder's credibility determination between the two plausible theories shall not be disturbed on appeal. Credibility determinations, including evaluating expert witness testimony, are for the trier of fact." The jury's awards are not unreasonable in light of the record before us.

Concerning past medical expenses, the general rule applied by this court has been that "[a] plaintiff's claim for past medical expenses is sufficient *when supported by a bill*, unless there is contradictory evidence or reasonable suspicion that the bill is unrelated to the accident." *Ardoin v. Bourgeois*, 04-1663, p. 5 (La.App. 3 Cir. 11/2/05), 916 So.2d 329, 334 (emphasis in original). Just as the jury failed to award all future medical expenses sought, it chose not award all claimed medical expenses, even after requesting a listing of those expenses from the trial court during deliberations. Based upon the above discussion, we, likewise, choose not to disturb this award.

### Decree

For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Plaintiff-Appellant, Carrie Menard.

**AFFIRMED.**

9