365 So.2d 633 (1978)
Gordon SCREWS and Borden's, Inc.
v.
Jerry PARKER.
No. 50125.
Supreme Court of Mississippi.
December 13, 1978.
Heidelberg, Woodliff & Franks, W. Swan Yerger, Watkins & Eager, Velia Ann Mayer, Jackson, for appellants.
John W. Prewitt, Vicksburg, for appellee.
EN BANC.
SUGG, Justice for the Court:
Jerry Parker filed suit in the Circuit Court of Yazoo County against Gordon Screws and Borden's, Inc. for injuries received *634 in an automobile accident. The trial court instructed the jury to find for the plaintiff against both defendants, whereupon the jury returned a verdict in favor of the plaintiff for $1,650. On motion of plaintiff a new trial was granted on damages only unless the defendants accepted an additur of $10,650. Defendants did not accept the additur and appealed under the provisions of section 11-7-213, Mississippi Code Annotated (1972). Plaintiff did not cross-appeal.
The principal question involved is whether the trial judge abused his discretion in granting a new trial because damages were inadequate. Section 11-1-55, Mississippi Code Annotated (Supp. 1975) authorizes trial courts to overrule a motion for a new trial upon condition of an additur or remittitur if the court finds the damages are excessive or inadequate for the reasons stated in the statute. The statute further provides that if the additur or remittitur is not accepted, then the court may direct a new trial on damages only. The additur was not accepted by the defendants so we must determine if the court abused its discretion in granting a new trial because of inadequate damages.
It was settled in City of Meridian v. Dickson, 266 So.2d 143 (Miss. 1972) that, on appeal under section 11-7-213, "The only issue that the party appealing can raise is whether the trial court abused its discretion in granting a new trial on the question of damages only."
In Biloxi Electric Co. v. Thorn, 264 So.2d 404 (Miss. 1972), the defendant, Biloxi Electric Co., did not accept the additur, appealed, and we reinstated the jury verdict of $6,500 holding the trial court abused its discretion by granting a new trial. Plaintiff did not cross-appeal. We reversed the action of the trial court which granted plaintiff a new trial unless the defendant accepted an additur of $6,000, and stated:
Therefore, the decisive question in this case is whether appellant has shown that the trial court manifestly abused its discretion in granting a new trial. As heretofore stated, a careful review of the evidence in this case convinces us that $6,500 was ample compensation for appellee's injuries. It is manifest to us that the trial court abused its discretion in granting a new trial. (264 So.2d at 406).
In Dorris v. Carr, 330 So.2d 872 (Miss. 1976), plaintiff, Carr, obtained a judgment for $4,500 against the defendant, Dorris. The trial court granted plaintiff a new trial unless the defendant agreed to an additur of $3,000. Defendant appealed, and we affirmed the action of the trial court in granting a new trial for the inadequacy of damages holding the trial court did not abuse its discretion in granting plaintiff a new trial based on the inadequacy of the damages awarded by the jury. After determining that the trial court properly granted plaintiff a new trial because of inadequate damages, the amount of the additur was then considered. A majority of the court was of the opinion that the amount fixed by the trial judge was proper and justified by the evidence. We provided for an additur on the same amount fixed by the trial court.
From the foregoing it is clear that, when a defendant does not accept an additur and appeals from an order granting a new trial because of inadequate damages, the scope of review on appeal is limited to the question of whether the trial court abused its discretion in granting a new trial.
In this case the defendants seek to have us review the action of the trial court in directing a verdict against them on the issue of liability and the refusal of an instruction requested by one of them. These questions are beyond the scope of review in this appeal; therefore, we will review the evidence to determine if the trial court abused its discretion by granting a new trial on damages only.
Parker was injured in a collision between an automobile and a truck on October 17, 1974 at approximately 6:00 o'clock a.m. The collision occurred on U.S. Highway 61 about four miles north of Valley Park just north of the intersection of Highway 61 and a road leading to the Delta National Forest to the east of Highway 61. The weather *635 was clear and the road was dry. Parker and Screws had spent all of the previous night at various night spots near Vicksburg and both of them had consumed some beer. Parker was driving when he and Screws left a night spot in Vicksburg to return to Holly Bluff where Parker and Screws both worked and lived. Parker drove about one mile and then Screws began to drive the automobile. Parker testified he observed Screws driving for about ten miles until he fell asleep. They proceeded north on Highway 61 with the intention of turning east onto the road which led through Delta National Forest and eventually to Holly Bluff. Screws was not familiar with the turnoff and went past it approximately 50 yards north of the intersection. Screws testified that he stopped in the right-hand lane with the intention of backing up; however, he could not get the automobile in reverse gear. He observed the lights of a vehicle approaching from the south about a quarter of a mile away. Screws said he pressed the brake pedal in an effort to attract the attention of the driver of the approaching vehicle and called out to Parker that the vehicle was going to hit the automobile. Screws estimated the vehicle was traveling about 65 to 70 miles per hour at the time of the impact; that the headlights and tail lights on the automobile were on; that no vehicles were approaching from the opposite direction; that the left lane was clear; and, that he and Parker were inside the automobile with the doors closed. Parker testified that he waked up when Screws missed the road leading to Delta National Forest and the next thing he remembered was Screws yelling that the vehicle was going to hit them.
Willie Washington, the driver of the Borden's truck, testified that he was proceeding north in the right-hand lane of highway 61 at a speed of 45 to 55 miles per hour. Washington testified that as he was coming out of a curve south of the point of impact his headlights reflected on the automobile approximately 100 feet away. Washington stated that no lights were visible on the automobile, neither were the brake lights flashing. Washington stated that he saw a man on the right side of the automobile standing with one foot inside the door and the other foot on the ground. Parker denied that he was standing with one foot inside the door and the other foot on the ground. Washington testified that another vehicle was approaching from the north and that he applied his brakes but did not sound his horn. The right fender of the truck driven by Washington hit the left rear of the automobile, knocking it off the road.
Pete Williams testified that he was driving a pickup truck south on Highway 61 and he saw the lights of the truck driven by Washington but did not see the lights of any other vehicle between him and the truck. Williams testified that as the truck neared him it swerved across the road into his lane and that he pulled off on the shoulder of the road to give the truck clearance and he first saw the automobile in the ditch east of the highway. He testified that no lights were burning on the automobile when he saw it but later the lights of the automobile were turned on.
John Earl Moore, a passenger in the Williams pickup, testified to the same facts. Moore also said the door of the automobile on the passenger side was open and Parker was lying face down in the ditch. He said that Parker was mumbling but he could not understand what he was saying. He testified that he smelled alcohol on Parker and Screws and he noticed a puddle on the highway that appeared to be where someone had urinated. Moore also stated that the lights on the automobile were not on when he first approached it in the ditch but within the next fifteen to twenty minutes the lights were turned on.
Washington further testified that he stopped his truck, returned to the scene of the collision and saw Parker lying partially under the automobile with his face in the water. He said he touched Parker's shoulder and Parker looked up and said to him: "You black s.o.b., you get your hands off me." Parker denied that he made such a statement.
*636 Patrolman Larry K. James of the Mississippi Department of Public Safety arrived at the scene at approximately 7:00 o'clock a.m. He observed Screws and Parker and stated that both appeared to have been drinking, but no alcohol was found at the scene of the collision. The patrolman noticed the stain just off the shoulder and expressed the opinion that it was urine. James testified that the car was knocked into the ditch, coming to rest approximately 120 feet from the point of impact and that the truck did not leave any skid marks.
At the scene of the collision the road was level with wide shoulders on each side with a curve immediately to the south. The driver of any vehicle proceeding north out of the curve of the point of collision had good visibility toward the north.
After the accident Parker was carried to a hospital, X-rayed, with no objective findings. Parker later consulted Dr. Charles Hogue of Yazoo City who took further X-rays of Parker's skull, neck, chest and back. None of the X-rays showed any fracture. Dr. Hogue testified that he found no concrete evidence of anything more than muscle spasms. Parker was hospitalized from October 19 to November 2 and again from December 4 to December 14. While in the hospital Parker was given pain relieving medication and muscle relaxants. Parker's medical bills for his treatment by Dr. Hogue amounted to $837 and his hospital bills were $928.75 and $543.30.
Parker testified that he was employed at the time of the accident, by F.H. Coghlan, a farmer who produced cotton and soybeans. He earned $85 a week and was furnished a house trailer. Parker testified he was unable to work from October 17, 1974 until May, 1975 when he obtained employment with a farmer in Louisiana doing the same work that he had previously been doing for Mr. Coghlan. Parker earned $100 per week after May, 1975 and was furnished a house trailer.
Based on the above evidence the trial court gave a peremptory instruction for the plaintiff against both defendants on the issue of liability and gave the defendants a contributory negligence instruction. Although the defendants urge that giving the peremptory instruction was error, this may not be considered because it is beyond the scope of review as discussed infra. Neither may we consider whether the court was correct in giving the contributory negligence instruction because the plaintiff did not cross-appeal nor assign this as error. City of Meridian v. Dickson, 266 So.2d 143 (Miss. 1972).
We recognize that the verdict of the jury did not fully compensate plaintiff for his medical expenses, loss of earnings and pain and suffering; however, the jury had been instructed by the court to consider the contributory negligence of the plaintiff. Undoubtedly the jury found that the plaintiff was guilty of contributory negligence to a substantial extent and reduced the verdict for this reason.
Obviously the jury did not believe plaintiff was exercising reasonable care for his safety under the circumstances in view of the testimony that plaintiff was standing by the side of an automobile without any lights on at night in the north bound lane of Highway 61; that he was under the influence of alcohol because he admitted that he had consumed eight or nine beers that night, and, when asked whether he could see how to drive, plaintiff responded: "Yes, Sir, I could see, but I didn't have any business driving."
In Standard Products, Inc. v. Patterson, 317 So.2d 376 (Miss. 1975) we reinstated the verdict of the jury where the trial court had allowed an additur, and, after quoting from Biloxi Electric Company v. Thorn, supra, stated:
This means that the trial court should determine, before allowing an additur to a jury verdict for damages, that the jury verdict was so inadequate under the facts in the case as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous and such as to manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. (317 So.2d at 379).
*637 In this case we feel that the verdict of the jury was proper although it did not fully compensate plaintiff for his damages. There was strong proof of contributory negligence and we feel that the size of the verdict reflects that the jury believed plaintiff was guilty of contributory negligence to a substantial extent.
In City of Meridian, supra, we stated:
When a defendant appeals because the trial court grants a new trial due to inadequacy of damages, it is asking the court to reinstate the judgment and by the very act of appealing it must be willing to accept the verdict in all other respects, including the determination of liability. Otherwise, there would be no way to limit the scope of appeal to the question of whether the trial court abused its discretion in granting a new trial on the issue of damages only. (266 So.2d at 144).
The defendants in this case appealed because the trial court granted a new trial on the ground the damages awarded by the jury were inadequate; therefore, under the rule announced in City of Meridian, supra, defendants must be willing to accept the jury verdict in all other respects. Having determined plaintiff was not entitled to a new trial due to inadequacy of damages, we reinstate the jury verdict.
REVERSED AND VERDICT OF JURY REINSTATED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER and BROOM, JJ., concur.
COFER and LEE, JJ., dissent.
BOWLING, J., took no part.
COFER, Justice, dissenting:
I dissent.
After a thorough examination of the record, I am convinced that the trial judge correctly granted a new trial unless additur was accepted by appellants.
As a preliminary statement, it is my view that appellee's conduct on the night ending with the accident and resulting injuries to him about six a.m., the following day, was less than commendable and not deserving of approbation. This may have influenced the jury in its paltry verdict of $1,650, but my dissent is not founded on that thesis. However, the best can be thankful that the protection of the law is not reserved alone to the pure in heart. (In Robertson v. Welch, 242 Miss. 110, 118, 134 So.2d 491, 494 (1961), the Supreme Court said "Intoxication, either in whole or in part, does not place the addict beyond the protection of the law. After all, such an unfortunate has rights just as any other human being or member of society.")
The record shows appellee was twenty-six years of age at the time of the vehicle accident, and in good health. The uncontradicted proof shows that, either as a passenger in the automobile in which he and appellant Screws were riding, or outside of the vehicle with one foot inside, he, with the vehicle was, by the impact, hurtled some one hundred or more feet into the borrow pit where he was found partly under the car and partly beside it; that he was taken by ambulance to the emergency room of Mercy Hospital, Vicksburg, where he was examined and released; the back side of his head and his neck and leg were hurting; when he reached home from the emergency room he had to be helped from the car and into bed; his wife washed "blood and stuff off him and he passed out; and on regaining consciousness, he talked irrationally."
Before midnight of that day, he had a high fever, just lying in bed and jerked; he was turned over on his side and went back to sleep.
Dr. Charles Hogue, his doctor during this treatment, testified. He first saw appellee at his clinic on October 19, 1974, at which time appellee complained of pain in his head, neck, and lower back area. He had bruises, there was a sore spot on the right side of his head; x-rays showed muscle spasm, (a tightening of the muscle,) but never showed any fractures or dislocations. He was hospitalized then from October 19, *638 1974, to November 2, 1974, and the doctor thought he should stay longer because of the pain he was suffering and the x-ray evidence of muscular spasm in his neck and back.
He was seen in Doctor Hogue's office on November 4, when he complained of hurting all over; on November 6; December 3; he entered the hospital again on December 4, and was discharged December 13, during which hospitalization, Dr. Hogue determined that he had had a concussion of the head, and now testified that he had had multiple contusions to his body generally. Dr. Hogue saw him again on December 18, 1974, December 26, 1974, January 3, 1975, January 15, 1975, January 23, 1975, February 13, 1975, February 27, 1975, March 15, 1975, November 28, 1975, and last saw him professionally on January 5, 1976.
There were some fourteen x-rays, not in an extravaganza, but five on the first visit, two each on December 3 and 26, 1974; and January 27, 1975; and one each on February 13, March 14 and November 20, 1975, used and useful in determining progress in his recovery, especially from the muscle spasm, which, Dr. Hogue testified, can be, but does not have to be, permanent, and indicates injury.
Throughout these calls and examinations, he persisted in suffering with this neck and back, which, he said, may be problems for a long time.
He incurred doctor bills with Dr. Hogue in the amount of $837; and hospital bills of $928.75 and $543.30, a total of $2,309.05. Dr. Hogue testified that these were necessary and reasonable and he further testified that he did not consider appellee was pretending, but had a real injury.
At his trial plaintiff testified that he was, while on the witness stand, suffering pain all across his back, about his belt line.
In the spring of 1974, appellee was employed as a farm hand by F.H. Coghlin, and continued in this employ as a satisfactory farm hand until the accident. His employment was for $85 per week with a house trailer furnished him and his family for living quarters, and with the understanding that, if he stayed through the crop season, he would receive a bonus of the average yield of twenty acres of beans, which, the employer without contradiction said that year amounted to about fifteen bushels per acre, which he estimated sold for about seven dollars a bushel. He undertook to work for Coghlin after the accident but was unable to do the work, and was not paid for any time after the accident nor did he earn the bonus, not being able to complete the crop.
Coghlin testified that, had he remained through the season able to work, and desired employment with him for 1975, they would have made such an agreement.
Although the record shows that appellee wanted to return to work, and was given reluctant permission to do so by Dr. Hogue, he was unable to work until May 1975, when he obtained employment similar to that with Coghlin on a farm in Louisiana. During this interval between the accident and May 1975, he was not working nor receiving wages.
The court granted plaintiff Parker a peremptory instruction against both defendants on the question of liability. He also granted appellants' request for two contributory negligence instructions:
The Court instructs the jury that if you believe from the evidence in this case that at the time of the aforesaid accident the plaintiff Jerry Parker was standing on the outside of a vehicle which had been stopped in the main traveled portion of the roadway at night and that there were no lights burning on said vehicle, and you further find that in so doing the said Jerry Parker failed to exercise a reasonable degree of care and caution for his own safety, then Jerry Parker was guilty of negligence. If you further find from a preponderance of the evidence that such negligence on the part of Parker, if any was a proximate contributing cause of the damages and injuries sustained by him, then it is your sworn duty to reduce any award of damages by that *639 proportion of negligence attributable to the said Jerry Parker, if any.
and
The Court instructs the jury that if you believe from a preponderance of the evidence in this case that the plaintiff Jerry Parker allowed the defendant Gordon Screws to undertake the operation of the motor vehicle at a time when Parker knew or in the exercise of reasonable care should have known that the said Screws had been drinking, and that the judgment or functions of Screws was impaired in any degree, then Jerry Parker was guilty of negligence. If you further find that such negligence if any was a proximate contributing cause of the injuries sustained by Parker then it is your sworn duty to reduce any award of damages to Parker by the degree of his negligence, if any.
The first of these had to do with the conflicting testimony as to whether appellee was in or beside or partially in and partially out of the vehicle at the collision. The court reluctantly gave this instruction, first reasoning:
Well, it's immaterial in considering this instruction, of course, but if he'd been standing outside of the car no reasonable juror would find that he would end up 120 feet away under the car or beside the car, anyway.
I acknowledge that weird happenings can come from a collision like this, but it challenges one's reasoning to conclude that appellee was standing outside or partially outside the car and was borne, along with the car, the long distance shown in the record ending up partially under the vehicle.
The second contributory negligence instruction quoted above, makes negligence appellee's act of letting appellant Screws drive the car, if appellee knew, or in the exercise of reasonable care, should have known that Screws had been drinking and that the judgment or functions of Screws were impaired in any degree.
The record establishes that appellee had consumed much beer. Appellee denied seeing Screws drink any alcoholic beverage that night, and during appellee's observation of his driving returning from Vicksburg, he was "A No. 1." Screws testified that, at Rolling Fork, where he and appellee first went, he drank a beer or two, did not know how many, "two or three cans, yes, sir." The last he had drunk, he said, was midnight or a little earlier. Witness Pete Williams saw a man leaning on the car door down in the borrow pit and he did not seem to be hurt, and he smelled alcohol on the man, it did not smell like beer. Witness Speed said that after the accident Screws was not handling himself too well, and had been drinking whiskey. Patrolman James said Screws' motor functions were impaired, and had the appearance "no definite way to describe it, of a man who had quite a bit to drink, not a stagger, because he did not seem to be drinking that much, just not a normal walk to me." There was no whiskey or beer in the car, he said, and he did not remember whether there was an alcohol odor on Screws. Washington, driver of appellant Borden's heavy truck, did not talk with Screws at the scene.
Turning to appellant Borden's participation in the negligence, its truck-trailer, weighing loaded, as it practically was, some 75,000 pounds came at forty-five to fifty miles per hour, according to its driver around a left-hand curve, and observed the car of Screws and appellee stopped in its right-hand lane. Whether the lights were on is disputed, as is Screws' testimony that he was pumping the brake pedal to get the truck driver's attention. Screws had over-run the turn off he intended to take, had stopped to change to reverse to return to the turn off, but was having difficulty in getting the gears changed, and this, he testified, caused him to be stopped in the road. The truck driver did not think the car was more than one hundred feet away when he first saw it. The testimony shows that witness Williams and his passenger were moving south in their right lane that there were wide shoulders on the road, and that by action of Williams' maneuvering his vehicle onto the shoulder, there was room for the truck-trailer to pull to the left lane and *640 avoid the collision altogether. Washington insisted that, had he taken this course he would have had a head-on collision with Williams' vehicle. The truck-trailer had its low beam lights on, which would light up a distance equal to the length of the rig, fifty-five feet or more; they were not on bright, the driver testifying that he did not need them that intense, although it was still dark. It was not yet dawn, but the weather was clear.
After the collision the truck driver went down into the borrow pit, and appellee was lying on his face, with his head in the water; he pulled him from under the car, and the driver said he told him, "You black s.o.b., you get your hands off of me," a statement flatly denied by appellee.
Under these circumstances, the issue is whether the trial judge was correct in granting a new trial on the damages issue only with condition of additur. As I perceive the threshold issue, it is not whether an additur in the amount suggested by the trial judge or any amount, was proper, but whether the verdict falls within the reach of Mississippi Code Annotated, Section 11-1-55 (Supp. 1978). This statute [Chapter 396, Laws of 1971], marked the advent of additur to the authority of courts in dealing with jury verdicts. Biloxi Electric Co. v. Thorn, 264 So.2d 404 (Miss. 1972).
It was amended by Chapter 411, Laws of 1972, and now reads, the amendment being only the last sentence thereof:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
This statute looks with favor upon additur as a means of relieving crowded dockets and expediting the end of litigation, according to the Thorn case, supra, 264 So.2d at 406. According to the wording of the statute, additur or remittitur may be made a condition upon which new trial will be denied, if the court finds that in the verdict, the judge or trier of fact (here the jury was influenced by bias, prejudice, or passion or that the damages awarded were contrary to the overwhelming weight of the credible evidence.
In this case, the judge, at the end of a painstaking trial and hard consideration of the entire record, including the presence of contributory negligence, found, on review thereof, that passion and prejudice were present in the record, and the verdict was contrary to the overwhelming weight of the evidence. Under the statute either finding would be sufficient.
Chief Justice Kent, writing in Coleman v. Southwick, 9 Johns 45, 53, 6 Am.Dec. 253 (New York, 1812), announced a legal principle touching upon interference with jury verdicts, 6 Am.Dec. at 258, part of which is quoted in 22 Am.Jr.2d, Damages, § 366, p. 473 (1965), which is in turn quoted in the Thorn opinion supra, and the majority opinion quotes from Standard Products, Inc. v. Patterson, 317 So.2d 376 (Miss. 1975), which, citing the Thorn case, supra says:
This means that the trial court should determine, before allowing an additur to a jury verdict for damages, that the jury verdict was so inadequate under the facts in the case as to strike mankind, at first blush, as being beyond all measure, unreasonable and outrageous and such as to manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. (317 So.2d at 379).
It is my view that we should return to the plain meaning of Mississippi Code Annotated, Section 11-1-55 (Supp. 1978), as the *641 Legislature expressed it, and remove the stern precedent findings which have followed Kent's pronouncements in the Coleman case, supra. In doing so, we would return to the lawmaking body the prerogative of lawmaking.
Regardless of what I think should be done, as expressed next above, I do not hesitate to say the the jury award is so inadequate as to strike me "at first blush, as being beyond all measure, unreasonable, and outrageous and such as to manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption," and contrary to the overwhelming weight of the evidence.
I would affirm the lower court.