490 So.2d 1210 (1986)
ANCHOR COATINGS, INC.
v.
MARINE INDUSTRIAL RESIDENTIAL INSULATION, INC.
No. 55548.
Supreme Court of Mississippi.
June 4, 1986.
*1211 William M. Rainey, Franke, Rainey & Salloum, Gulfport, for appellant.
Harold J. DeMetz, Gulfport, for appellee.
Before PATTERSON, C.J., and DAN M. LEE and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Roofing contractor brought suit against the distributor and the manufacturer of insulating materials alleging, inter alia, defective manufacture of products marketed as Anchor Coating Sunshield 790-A, 6015 and 6016; and Anchor Coating White  Cap; a breach of product warranty and the wilful, wanton and negligent putting into commerce of a defective product and such acts and omissions being a proximate cause of Plaintiff's injuries. In praying for relief the contractor sought $640,000.00 in actual damages and $700,000.00 in punitive damages.
The manufacturer subsequently answered and denied all material allegations and set up as affirmative defenses that contractor's alleged injury was due to its failure to apply manufacturer's products as instructed by the manufacturer, together with contractor's failure to adhere to accepted practices within the roofing industry.
After a lengthy discovery process a jury trial finally commenced on Monday, October 26, 1981, and lasted for 15 days, with the jury returning a verdict for the Plaintiff contractor, and against the Defendant manufacturer in the amount of $268,112.00. The trial court had peremptorily instructed the jury to find for the co-Defendant distributor.
The Defendant manufacturer has filed its appeal and assigned an exhausting 22 errors. The contractor in turn has cross-appealed and assigned error in the ordering of a remittitur. We affirm on direct appeal and reverse and render on cross-appeal.

II.
Marine Industrial Residential Insulation, Inc. (hereinafter "MIRI") is a Mississippi corporation engaged in the roofing business with principal offices in Long Beach, Harrison County, Mississippi. Larry Tully and James English are president and vice president of the corporation. MIRI was the Plaintiff below and is the Appellee/Cross-Appellant in this instance.
*1212 Roofing Systems and Coatings, Inc. is a Mississippi corporation which maintains its principal offices in Gulfport, Harrison County, Mississippi, and Hugo F. Carbajo is the president. At the time of this suit Roofing Systems was the authorized distributor for Anchor products in Mississippi and was a Defendant below. The trial court directed a verdict in Roofing Systems' favor, and it is not a party to this appeal.
Anchor Coatings, Inc. is a foreign corporation organized under the laws of the State of Wisconsin with principal offices at Waukesha, Wisconsin. Anchor is engaged in the development and manufacture of insulating materials. Anchor was a Defendant below and is the Appellant here.
On May 3, 1979, MIRI entered three separate contracts with the Vicksburg Municipal Separate School District for the reroofing of Grove Street Elementary School, Bowmar Elementary School and Vicksburg High School. Thereafter, on July 3, 1979, MIRI contracted with the Board of Trustees of the Poplarville City Schools for the reroofing of Upper Elementary School, Lower Elementary School, and the high school (both junior and senior). The six schools in question were reroofed by MIRI using Anchor Coatings materials. Many problems resulted.
In due course each of the school districts made claims against its contractor, MIRI, which in turn brought this indemnity action in the Circuit Court of Harrison County, Mississippi, First Judicial District, against Anchor Coatings, Inc., and Roofing Systems & Coatings, Inc., the local distributor of Anchor Coatings products. Among other things, MIRI charged Anchor with providing defective products. Anchor's defense was that the coatings were improperly applied by MIRI employees and that the problems with the roofs of the Vicksburg and Poplarville schools were the direct result of the faulty application of the coatings by the contractor.
At trial MIRI's president, Lawrence A. Tully, testified that he was trained by an employee of the Upjohn Company and was certified by Anchor Coatings as an applicator of polyurethane foam. His company had roofing contracts with the two school districts totaling $345,066.00. Roofing Systems' president, Hugo F. Carbajo, had recommended Anchor products in substitution of the products specified in the bids. The architects had approved the substitution after he (Hugo Carbajo) furnished them with Anchor coating literature describing the material.
Tully stated that the Poplarville school project bids were submitted based on Anchor products. Various officers of Anchor Coatings  namely Bob Schmidt and Dave Purcell  advised him in positive terms of the suitability of Anchor products. Hugo Carbajo also inspected the roofs and indicated that Anchor products would be suitable. The roofs were adequately prepared  such testimony was corroborated by another witness, Wayne Jameson, maintenance supervisor of Vicksburg schools  and the foam and the coatings were applied in accordance with both the contract specifications and the manufacturers' instructions.
Problems, however, became evident after MIRI had applied the coating. Tully discussed this with Anchor personnel who in some instances came down to inspect the building and recommended changes in the ratio of the materials to be applied. In another instance Anchor sent an independent consultant, Earl N. Doyle, who, after his initial inspection, concluded that the problems were due to faulty application of the material.
During the application of the foam and coating Tully testified that MIRI relied on Anchor's technical people, David Purcell and Dave Bigsby. They changed application from that specified on Anchor's printed material due to problems with brown leaching on the roofs. The material would not dry and it cracked on the second or third day after it was put down. Bigsby told him some of these problems were normal with the material. He said where it was cracked they should wipe it off, peel it off, put new base coat down and a new top *1213 coat. Bigsby advised that the problems would be solved if MIRI employees modified the application rate to a much thicker gray under-coat and a much thinner white top-coat.
After MIRI modified the application, the problems seemed to have been solved, but they were not. On final inspection by the architect and the Educational Finance Commission from the State Department of Education, there were bubbles in the coating. The coating had cracked and would not adhere to the foam. Tully had a three-way telephone conversation with Bigsby and Kramer of Anchor, and Anchor personnel came down and inspected the roofs. Kramer came down in March or April of 1980 and said, "We definitely have a material problem."
In December of 1979 Dave Bigsby came to Vicksburg and inspected the roofs, and at that time it appeared the problems had been solved. After this visit by Bigsby, Anchor approved the job and issued its warranties to the School District and wrote the architects that Bigsby had inspected the roofs, measured the thickness of foam and coating and approved the job.
Philip Maslow, an expert witness, conducted tests on the roofs and based on the results, concluded:
It was my opinion, based on the tests I ran, the tests conducted by D.L. Laboratory, and my inspection of the roofs, and the literature supplied by Anchor Coatings, that water-base coating was not the kind of roofing membrane that should be used on a flat roof and, in fact, is not suitable for flat roofs. There was a failure of the material on the Vicksburg and Poplarville school roofs. The material evidenced blistering, peeling, lack of adhesion and softening, all of which could have been expected based on the permeability properties of the coating. In my opinion, the foam was properly applied to the Vicksburg High School roof since it had adhered to the built up tar roof. Where the foam does not adhere to the tar, if water penetrated through the membrane and lodged between the foam and the tar, it could cause leaks in the roof and, once the sun heated up the roof, the foam above the tar would be heaved. I did see blisters on the roof ranging from the size of two to twelve inches in diameter. Film applied over a layer of dirt could produce delamination of a latex emulsion. Delamination could also possibly result from oxidized foam or powdery dust on the top of the foam. The samples which I took covered a total area of three square feet out of the 250,000 square feet of roofing performed by MIRI. If the film has not had sufficient time to cure, the latex acrylic emulsion coating will wash off in rain. The sample of Anchor Coatings material I removed from the drum almost matched the properties set out in the Anchor Coatings literature. When I opened the drum, I found no separation of the solids from the liquids and there was no liquid on the top of the barrel. Larry Tully and I stirred the drum before I removed the sample in order to ensure that the sample was representative. I do not know how long the drum had been sitting out in the open prior to taking the sample on April 8, 1981.
Max L. Harris was an architect on the Vicksburg projects. Prior to the reroofing in 1979, the three Vicksburg schools had standard flat built up roofs, all of which were in poor condition and had evidence of ponding. According to the project specifications, the foam was to be applied in a manner to provide the positive drainage, i.e. sloping. Harris testified that MIRI complied with all specifications. After the change in material from that specified in the project manual, Harris reviewed all the literature supplied by Anchor Coatings and concluded that, based on the literature, Anchor products would be suitable.
On December 26, 1979, Anchor Coatings wrote Harris that they had made a personal inspection of the three school roofs in Vicksburg, that all of MIRI's work was very satisfactory to them, that they took samples of the dry millage and that they *1214 were then issuing their five (5) year warranties on the roofs.
The independent test on mill thickness of the coating on the Vicksburg schools shows less than 25 mills. Yet the Anchor Coatings letter of December 26, 1979, was some months before the independent test and it showed 25 mills thickness.
Steven A. Murray was a former employee of Anchor Coatings and was in charge of the development of the products in controversy in this litigation. He was aware of the problems of a water-base material, and he knew that drying time was questionable [Tully had testified to drying time as being one of the myriad of problems encountered with the products]. Murray was also concerned about applying these materials to flat roofs. He was not satisfied with the product and, as such, had recommended to his then employer, Anchor Coatings, that the product not be placed on the market. In spite of Murray's recommendation, Anchor released the product for sale to the general public without the additional field tests being done. Murray also testified that Anchor Coatings' literature on the Sunshield was deceptive.
Joseph Jerry Ogleby was an MIRI employee who worked on the school projects. Ogleby testified that all necessary preparations were done on the roof to ensure proper bonding of the materials to the roof. Ogleby largely corroborated Tully's testimony regarding the problems encountered by MIRI. He stated that at no time did MIRI apply the material on a wet surface. Other employee-witnesses in large part corroborated his testimony.
John C. Suffling was the architect for the Poplarville project. His testimony was comparable to Harris' regarding Vicksburg. Suffling stated that the foam had never given them any trouble; that it was the coating, the Anchor product which was defective. In his opinion, the failure of the Poplarville school roofs was caused by the Anchor coating. It would not adhere to the foam, didn't glue and would wash off.
Another witness, Ron Werby, secretary/treasurer of Roofing Systems, testified that Hugo Carbajo convinced the architects to switch from Diathon (the material specified in project manual and used in the bids) to Anchor products. There is a $1.25 price differential between Anchor materials and the Diathon. Roofing Systems gave technical advice and assistance to MIRI during the project.
Hugo Carbajo, Roofing Systems' president, testified that he did not recommend one product over the other but only pointed out differences between the two. He supervised the Poplarville project before he got injured. Carbajo was of the opinion that the application of the coating was done in a proper manner.
Debra Fustin, an employee of Anchor Coatings who worked with Steve Murray on the development of the Anchor products contradicted some of Murray's testimony, especially the fact that he [Murray] had expressed doubts on the suitability of the product for marketing.
John A. Gordon testified as an expert witness. He had examined the subject roofs and concluded that where there were defects, the work did not meet the manufacturer's specifications. "There were foam blisters indicating a delamination of the upper and lower layer of the foam with the lower layer of foam being very dirty, indicating little, if any, surface preparation prior to the application of the foam." Gordon supported Anchor's view that the problems were not due to defective products but faulty application. He further questioned the use of samples from two drums  the samples used by Philip Maslow to conduct his test  and concluded that those samples were not representative of the product because they had deteriorated due to exposure.
Earl Nathan Doyle, plastics consultant, who had been retained earlier to examine the project and offer recommendations, also testified. He, too, faulted the application process and agreed with Gordon's opinion that the sample used by Maslow was defective. Doyle also stated that *1215 there was no evidence that the coating itself had any defect when properly applied. It was further his opinion that the cause of the roof problems that he observed in Vicksburg and Poplarville was poor workmanship.
Robert Dwyer's testimony also faulted the application process. Lawrence Tully was recalled and his testimony was to explain video tapes of the reroofing work in progress. At the conclusion of this the jury was instructed and after their deliberation, they returned a verdict for MIRI and against the Defendant, Anchor Coatings, in the sum of $268,112.00. The trial court, believing the verdict to be excessive, ordered a remittitur to $150,000.00 which MIRI accepted.
Anchor's appeal has followed, with MIRI cross-appealing the remittitur order.

III.
Anchor's first three assignments of error challenge all aspects of the jury's verdict and in that regard involve considerable overlap. Significantly, Anchor makes no contention that it was entitled to a peremptory instruction or judgment notwithstanding the verdict. Rather, Anchor's argument is that the verdict is against the overwhelming weight of the evidence, both with respect to the matters of liability and damage, and the latter even though the trial court ordered a substantial remittitur.
The question necessarily tendered by Anchor's assignment of error is whether the trial judge erred in overruling Anchor's motion for a new trial. The grant or denial of a motion for a new trial is and always has been a matter largely within the sound discretion of the trial judge. Adams v. Green, 474 So.2d 577, 582 (Miss. 1985); Clark v. Columbus & Greenville Railway Co., 473 So.2d 947, 950 (1985). The credible evidence must be viewed in the light most favorable to the non-moving party. The credible evidence supporting the claims or defenses of the non-moving party should generally be taken as true. When the evidence is so viewed, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion. Clayton v. Thompson, 475 So.2d 439, 443 (Miss. 1985); Jesco, Inc. v. Whitehead, 451 So.2d 706 (Miss. 1984).
We observe that the jury had before it the expert testimony of Philip Maslow, the testimony of Steven Murray who developed the Anchor Sunshield 790A coating in question, the testimony of Max Harris, architect for the Vicksburg Public Schools, and John Suffling, architect for the Poplarville Schools, along with the testimony of Lawrence A. Tully and James C. English, president and vice president of MIRI, respectively. All of this testimony has been summarized above. That such testimony was substantially contradicted by that of the three experts offered by Anchor is of no moment. We are simply unable to say that the trial judge abused his discretion in denying Anchor's motion for a new trial.
The same may be said on the issue of damages, about which more will be said later. Given the totality of the evidence in this case on the matter of damages  viewed in the light most favorable to MIRI  the jury's verdict is not so high as to shock the conscience of the Court. See Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 278 (Miss. 1985); Screws v. Parker, 365 So.2d 633, 636 (Miss. 1978); Reeves Contractor, Inc. v. Chain, 343 So.2d 1229 (Miss. 1977). Cf. Clark v. Columbus & Greenville Railway Co., 473 So.2d 947 (Miss. 1985).

IV.
Anchor next assigns as error the trial court's ruling allowing Lawrence Tully to testify concerning conversation he had with David Purcell, a technical representative of Anchor, regarding the physical properties of Anchor's materials. The vice in this testimony, we are urged, is that it is hearsay. No doubt this is true, but Purcell *1216 was an authorized representative of Anchor. The testimony concerned information Tully, acting on behalf of MIRI, obtained from Purcell before the job ever started regarding the substitution of Anchor's coating for diathon. The testimony was relevant as a small part of the story of these reroofing projects gone awry. The trial judge was well within his authority in allowing this testimony. The assignment of error is denied.

V.
Over Anchor's objection the trial court allowed MIRI to introduce in evidence express warranties executed by Anchor and MIRI to the Vicksburg and Poplarville School Systems, as well as a letter dated December 26, 1979, from Dave Bigsby of Anchor to Bouchillon and Harris, the architects on the Vicksburg project, referring to warranties issued to the Vicksburg School District.
The letter was relevant to establish that Anchor had inspected the roofs in Vicksburg, had taken measurements, made tests, and satisfied itself that the materials had been properly applied. The fact that the warranties were issued also suggests that Anchor was satisfied with the installation of its materials. The issue at trial being whether the materials were faulty or whether they were improperly installed made both the letter and the warranties evidence the trial judge was well within his discretion in admitting. The assignment of error is denied.

VI.
Anchor urges that the trial court erred in permitting evidence of repair costs for material that exceeded the original cost of Anchor's material and was of a totally different nature.
The original material, use of which was contemplated by MIRI on these projects, was diathon, and it cost $16.95 per gallon. The substituted Anchor material cost $12.00 per gallon. The bids by MIRI to the Vicksburg and Poplarville Schools reflected a reduction in the bid cost to take into account the reduced cost of the material. The trial court allowed MIRI to show, as a part of its damages, the repair cost to the various school roofs. This is permissible under the rule of Gerodetti v. Broadacres, Inc., 363 So.2d 265 (Miss. 1978) wherein the Court stated
The Chancery Court should have awarded damages to Appellees for the failure of Bevis to carry out its agreement with them in a sum sufficient to finish the construction of the building; or a sum sufficient to bring the building up to the specifications of the contract and agreement between the parties, together with other damages due them as was shown to have grown directly out of the failure of Bevis to carry out its contract and understanding.
MIRI charged numerous items of expense resulting from the defective Anchor coating. In Gerodetti, supra, the Court said:
We are of the opinion that because of the nature of defects involved, the cost rule may be applied to some and the diminished value rule to others. The Court defined the cost rule as being the cost of repairing the defects to make the building or structure conform to the specifications where such may be done at a reasonable expense if unreasonable economic waste is not involved and diminished value rule as the difference in the value of the property with defective work and what the value would have been if there had been a strict compliance with the contract.
In the instant case we are talking about the cost rule, because it was necessary for MIRI to make substantial repairs to and total replacement of these roofs. John Suffling, Architect for the Poplarville Schools, approved the substitution of Plaskem in the re-roofing as same would meet specifications and the manufacturer furnish five-year warranty to the roofs. The mere fact that this material costs more than originally applied is of no consequence to the case at bar.
*1217 Here, Anchor confuses admissibility with weight. It was certainly entitled to elicit through cross-examination or through its own proof that the materials used for repairs and replacements were unreasonably expensive. Anchor was certainly entitled to argue the point to the jury. The point for the moment, however, is that MIRI was entitled to prove the expenses it contends it was put to by reason of Anchor's having furnished a defective product. Likewise, MIRI was entitled to argue that the expenses it incurred were reasonable and necessary. To this end, the evidence here challenged was admissible. The assignment of error is denied.

VII.
Continuing its trial pattern of challenging everything MIRI did or attempted to do below, Anchor presents five assignments of error, one challenging each of the five witnesses called by MIRI who testified as experts. Specifically, MIRI alleges that the trial court erred in permitting James C. English to testify that the coating failed or was defective, in allowing Philip Maslow to testify as an expert on urethane foam roofs and as to the results from the D.L. Laboratory, in allowing Steven Murray to testify as an expert, in allowing the two architects, John Suffling and Max Harris, to testify as experts on urethane foam roofs.
This was obviously a case where expert testimony would be of assistance to the jury and the trial judge correctly so determined. To be sure, our law requires that one offered as an expert witness be qualified by knowledge, skill, expertise, training or education. See, e.g., Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985). An expert witness must be qualified in fact before he or she may provide opinion evidence, although necessarily this determination involves the exercise of a certain amount of discretion on the part of the trial judge. Mississippi Farm Bureau Mutual Insurance Company v. Garrett, 487 So.2d 1320 (Miss. 1986); Hollingsworth v. Boviard Supply Co., 465 So.2d 311, 314-15 (Miss. 1985); Early-Gary, Inc. v. Walters, 294 So.2d 181, 185 (Miss. 1974); Bynum v. Mandrell Industries, Inc., 241 So.2d 629 (Miss. 1970).
The record reflected that English, one of the principals in MIRI, was a qualified and experienced roofer. He had personally worked on at least ten jobs where urethane foam roof was applied and had applied a couple of hundred thousand feet of foam and coating.
Philip Maslow, a witness who testified as an expert, has a bachelor's and post graduate degree in chemical engineering. He had worked as a chemist in the Navy and was responsible in developing paint formulae for war ships. He was later involved in research and development of industrial coatings and marine coatings. He inspected the subject roofs.
Steven Murray had worked for Anchor and researched and developed the product now in the center of this dispute. John Suffling, the architect of the Poplarville project, also testified as an expert and gave an opinion on why the roofs failed.
Again, Anchor confuses questions of weight with admissibility. We have little doubt that the trial judge was well within his discretion in allowing each of these five witnesses to give opinion testimony regarding urethane foam roofs. As with any expert witness, of course, the opposing litigant had full right of cross-examination both with respect to the qualifications of the witnesses and the bases and validity of their opinions. That the trial judge apparently chose to credit MIRI's experts' opinions is hardly a matter that can be invoked on appeal as a basis for relief.
We are of the opinion that the trial judge committed no error in overruling Anchor's objections to the opinion testimony of any of these five witnesses and deny the assignments of error in that regard. In doing so we would remind counsel that the old shibboleth that a witness' opinion evidence invades the province of the jury has met its long overdue interment. Hollingsworth v. Boviard Supply Co., 465 So.2d *1218 311, 314-15 (Miss. 1985). See also Rule 704, Miss.R.Ev., effective January 1, 1986.

VIII.
Anchor also challenges the testimony of Steven A. Murray on the grounds that his name had not been timely furnished to Anchor in pre-trial discovery.
As indicated above, Murray was a former employee of Anchor. His testimony to the effect that the Sunshield 798 product had not been properly developed, tested and refined was obviously devastating to Anchor's case.
The record reflects that Anchor had propounded garden variety interrogatories requesting that MIRI furnish the names of its witnesses at some time prior to trial. The first problem with Anchor's position is that discovery may not be used to compel disclosure of trial witnesses, only occurrence witnesses. Ladner v. Ladner, 436 So.2d 1366, 1371-72 (Miss. 1983).
Be that as it may, the record reflects that the trial of this action began on October 26, 1981. Four days before trial, counsel for MIRI learned of the availability of Murray as a witness. On that same day, October 22, 1981, MIRI had hand delivered to counsel for Anchor a letter naming Murray as a witness. This disclosure was wholly consistent with MIRI's continuing duty to make discovery and to supplement its responses to interrogatories. See Scafidel v. Crawford, 486 So.2d 370, 372 (Miss. 1986); Denman v. Hardy, 437 So.2d 426, 428 (Miss. 1983). Nothing in this record reflects that MIRI withheld Murray's name until the last minute. We hold that under these circumstances, four days advance notice was sufficient that the trial judge may not fairly be said to have abused his discretion in overruling Anchor's objection to Murray's testimony on this ground.

IX.
Anchor next complains of the trial judge's submission to the jury of an instruction which reads, in pertinent part:
(d) that at the time of the same the Defendant, Anchor Coatings, Inc., and its distributor, the Defendant, Roofing Systems and Coatings, Inc., knew, or had reason to know the product, Anchor coating Sun-Shield 790A roof coating was to be used; and,
(e) that the Defendant, Anchor Coatings, Inc., and its distributor [sic], Defendant, Roofing Systems and Coatings, Inc., at the time of the same, knew or had reason to know that M.I.R.I. was relying on the skill and judgment of the Defendant to select or furnish a suitable roofing coating for the intended purposes of installing the roofs on the aforesaid [sic] schools; and,
(f) that at the time of the sale the Defendants exercised their skill and judgment in furnishing and selecting Anchor Coating Sun-Shield 790A roof coating, and that M.I.R.I. relied thereon; and,
(g) that the Anchor Coating Sun-Shield 790A was not reasonably fit and suitable for the use for which it had been purchased ...
Anchor Coating believes that since MIRI pleadings did not specifically articulate a theory of implied warranty, it was error to give the instruction. MIRI attempted to amend its pleading on the eve of trial to specifically plead a "breach of implied warranty", but this was not allowed by the trial judge.
Notwithstanding this omission, Anchor cannot complain. MIRI's declaration charges
That Anchor Coatings has repudiated and breached its products warranty and has made no effort to take corrective steps to have the aforesaid roof installed properly. As a result of the total and negligent breach of its warranty contract, ... . That the wilful and wanton failure of Defendants to honor the warranty contract... .
Even though the magic words "implied warranty" are not used, it is clear that MIRI was suing Anchor on its warranty of the fitness of its product for the use for which it was intended. In this connection, *1219 we find no error in the granting of MIRI's Instruction P-3.

X.
Anchor charges that the trial court erred in failing to grant a mistrial when the witness, Robert A. Dwyer, stated that he was being paid by an insurance company.
Evidence or statements made before the jurors in effect informing them that a party defendant has insurance coverage has long been held to be error. Herrin v. Daly, 80 Miss. 340, 31 So. 790 (1902); See Rule 411, Miss.R.Ev., effective January 1, 1986. The mere mentioning of insurance in a trial is not cause for mistrial in all cases. See Chilcutt v. Keating, 220 Miss. 545, 71 So.2d 472 (1954); Miss. Ice Utilities Co. v. Pearce, 161 Miss. 252, 134 So. 164 (1931). More recently, considerable discretion has been indulged the trial court in ruling upon comments concerning insurance during trial. West Cash & Carry Bldg. Materials v. Palumbo, 371 So.2d 873, 876 (Miss. 1979); Copiah Dairies, Inc. v. Addkison, 247 Miss. 327, 339, 153 So.2d 689, 694 (1963).
In the case sub judice, the witness Dyer was asked who was paying him to testify and he replied "the insurance company". This does not rise to the proscription of the rule. The trial court did not abuse its discretion in refusing to declare a mistrial. See Skelton v. Turnipseed, 235 So.2d 694, 697 (Miss. 1970); Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216, 223 (Miss. 1969). The assignment of error is denied.

XI.
Far from exhausted, Anchor assigns numerous alleged errors committed in the trial proceedings over and above those discussed above. We have carefully considered each of these additional assignments and find that none merits comment nor reversal.

XII.
MIRI cross-appeals and assigns as error the trial judge's ordering of a remittitur. It will be recalled that the jury returned a verdict in favor of MIRI and assessed damages at $268,112.00. In due course thereafter the trial judge ordered that MIRI accept a remittitur reducing the amount of its damages to $150,000.00 or suffer a new trial on the issue of damages. MIRI thereafter entered its acceptance of the remittitur and assigns on cross-appeal that the trial court erred in ordering it to do so.
Under our law remittiturs may be ordered by the trial court if it
finds that the damages are excessive ... for the reason that the jury or trier of the facts was influenced by bias, prejudice or passion, or that the damages awarded were contrary to the overwhelming weight of the credible evidence. Miss. Code Ann. § 11-1-55 (Supp. 1985).
Here MIRI suffered such an order for remittitur. In order to challenge on appeal the remittitur order, MIRI has followed the prescribed procedure, that is, MIRI has accepted the remittitur, thereby pretermitting a new trial on damages, and has appealed to this Court charging that the trial judge abused his discretion in granting the remittitur. We agree.
We begin with the fact that MIRI proved actual out-of-pocket expenses attributable to Anchor's breach in the amount of $250,914.77. This amount included $171,330.81 to reroof the Vicksburg and Poplarville Schools, $21,000.00 in labor, $37,711.78 in materials to reroof the Bomar School in Vicksburg, $20,872.18 in labor and materials to make repairs to the Vicksburg School roof between April 1980 and August 1980. Beyond this MIRI lost its entire profit on these jobs. Moreover, the School Board withheld substantial retainage on each job. Giving MIRI the benefit of the doubt on these items of damage  as in the present posture we must  the jury's damage assessment of $268,112.00 seems pretty close to the mark, although we concede we are not clear on exactly how the odd sum was computed.
Viewing the evidence as we must, there is nothing about this verdict which is shocking. *1220 Rather, considering the factual dispute as having been resolved in favor of MIRI, the verdict appears quite rational. See Thames & Company v. Eicher, 373 So.2d 1033 (Miss. 1979). We hold, therefore, that it may not by any stretch of the imagination be said that the jury's verdict was so high as to shock the conscience of the court. Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 278 (Miss. 1985). Accordingly, the trial judge abused his discretion in granting Anchor's motion for a remittitur. The cross-assignment of error is sustained.
AFFIRMED ON DIRECT APPEAL; REVERSED AND RENDERED ON CROSS-APPEAL.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ.